342 So.2d 476 (1977)
UNITED STATES of America, Plaintiff-Appellee,
v.
16.33 ACRES OF LAND IN the COUNTY OF DADE, State of Florida, and Sterling Investments, Inc., et al., Defendants-Appellants.
UNITED STATES of America, Plaintiff-Appellee,
v.
156.65 ACRES OF LAND IN the COUNTY OF DADE, State of Florida, and Sterling Investments, Inc., et al., Defendants-Appellants.
No. 50243.
Supreme Court of Florida.
January 13, 1977.
Rehearing Denied March 10, 1977.
*477 Peter R. Taft, Asst. Atty. Gen., Washington, D.C., Robert W. Rust, U.S. Atty., Miami, and Jacques B. Gelin, Harry W. McKee and Eva R. Datz, Dept. of Justice, for plaintiff-appellee.
Rollo E. Karkeet, and Robyn Greene, of Greene & Cooper, Miami, for defendants-appellants.
HATCHETT, Justice.
Sterling Investments, Inc. (Sterling), sought to establish a compensable interest in condemned property in the course of condemnation proceedings in the United States District Court for the Southern District of Florida. Whether Sterling has an interest in the property is a question of state law, which was considered as such, and decided adversely to Sterling by the United States District Court. When the cause was appealed to the United States Court of Appeals for the Fifth Circuit, that court certified to us the question of what interest in the property, if any, Florida law gives Sterling. 537 F.2d 182 (5th Cir.1976). The facts are stated in the Fifth Circuit's certificate, prepared pursuant to Rule 4.61, Florida Appellate Rules, 1962 Revision, as follows:
Introduction.  This action was begun by a complaint filed by the United States to condemn certain real estate in the Elliott Shores Subdivision on Elliott Key, in Dade County, Florida. The record title holders of the subdivision lots were designated as the defendant-landowners. Sterling Investments, Inc. (Sterling), as successor-in-interest to the original developer, filed an answer alleging that it is the fee simple owner of all the avenues, roads and boulevards as shown on the plat of the subdivision. (R. 298).
The District Court, by its order of June 2, 1975, disallowed Sterling's claim, holding, inter alia, that the conveyances by the original developer of "the lots abutting the streets and roads by reference to the plat carried title to the center of the abutting roadway subject to the rights in favor of the public all in accordance with the law of the State of Florida" (R. 627). Sterling appealed to the United States Court of Appeals for the Fifth Circuit. The Fifth Circuit determined that issues of state law may be dispositive of this case and ordered that it be certified to the Supreme Court of the State of Florida.
A. Background.  The Biscayne National Monument was authorized October 18, 1968, and formally established June 12, 1970, 82 *478 Stat. 1188 (R. 477). The United States instituted four proceedings to acquire the land needed for the establishment of the Biscayne National Monument:

 Date Date Notice of
 Style of Lawsuit Complaint Filed Lis Pendens Filed
 United States v. 95,064 acres 4/8/70 4/13/70
 of land, No. 70-477-Civ-CF (O.R. 6821, p. 232)
 [This was a proceeding against
 the State of Florida to condemn
 its interest in the project area.]
 United States v. 338.87 acres 8/18/72 8/31/72
 of land, No. 72-1311-Civ-CF (O.R. 7872, p. 126)
 [This was a proceeding to condemn and amended 11/8/72
 land on Old Rhodes, Totten, (O.R. 7970, p. 773)
 Rubicon and Elliott Keys.]
 United States v. 16.33 acres 9/20/72 9/22/72
 of land, No. 72-1509-Civ-CF (O.R. 7904, p. 137)
 [The instant proceedings.] and amended 12/17/72
 (O.R. 8041, p. 52)
 United States v. 156.65 acres 9/28/72 9/29/72
 of land, No. 72-1548-Civ-CF (O.R. 7915, p. 413)
 [The instant proceedings.]

B. Elliott Key is an island approximately eight miles long. Elliott Shores subdivision is approximately two miles north of the southern tip of Elliott Key. The subdivision is approximately one-third of a mile wide and extends from the Atlantic Ocean to Biscayne Bay.
C. Elliott Key has never been connected to the mainland of Florida and is accessible only by boat. The terrain consists of jagged coral rock covered with an almost impenetrable growth of salt water vegetation. The ocean shoreline is land and rock, and the bay shoreline is mangrove fringe. The island has no public utilities. There are no roads capable of vehicular use. A footpath, wide enough for a hiker or two, has been hacked through the vegetation, and periodic attempts are made to keep it open.
D. There is no evidence that Elliott Shores has ever been surveyed, cleared, or even staked. It is uninhabited. Elliott Key itself has a small municipal marina with no overnight facilities. The island attracts fishermen, boaters, nature hikers, and other recreational users interested in exploring undeveloped, virgin land (M. 2).
E. In 1926, Miami Bank, STERLING'S predecessor in title, recorded a plat of the property. The entire subdivision has been sold and resold from the plat as recorded in the Public Records of Dade County, Florida, in Plat Book 23, on page 24, as it has been impossible for anyone to determine visually the location of any of the lots or roads (R. 625, M. 3).
The plat filed by Miami Bank states (R. 626):
"That all avenues, roads and boulevards as shown on said plat attached are hereby dedicated to the perpetual use of the public for proper purposes reserving to ourselves, our heirs, administrators, executors, or assigns, the reversion or reversions thereof if ever discontinued by law."
The plat goes on to state (R. 444):
"[E]very conveyance of any real estate in this subdivision which may be made hereafter shall be subject to the following restrictions:
"1. All lots shall be restricted to residential purposes only with the following exceptions * * * which shall be designated as business lots. This restriction shall not operate against the erection in the subdivision of apartment houses or hotels.
"2. All buildings in said subdivision shall be of fire resisting materials * *.
"3. No residence shall be erected at a less cost than Three Thousand Dollars * * *.

*479 "4. No building shall be erected on a business lot at a less cost than One Hundred Dollars * * * per story for each front foot of the lot * * *.
"5. No residence * * * shall be constructed * * * closer than Fifty * * * feet to the centre line of the adjacent street * * *.
"6. No garage * * * shall be used for residential purposes * * *.
"7. A septic tank * * * shall be put on the * * * property * * *.
"8. No spirituous or intoxicating liquor shall be manufactured, bartered or sold in * * * said subdivision * *.
"9. No livestock shall be kept * * in said subdivision * * *.
"10. No unlawful or immoral use shall be made of the premises * * * nor shall any interest therein be sold * * to any person other than of the Caucasian race * * *.
"11. The privilege is hereby reserved to the said first party, its successors or assigns to erect and maintain electric and telephone poles, and suitable equipment for any other utilities and to lay water mains on or in the rear five feet of the land hereby conveyed, or on or in the three foot strip along the side line thereof, when necessary, to gain access to the five foot strip reserved along the rear lines of lots * * * for utility purpose and for such purposes as well as to repair, remove or replace said poles, equipment and mains, the said first party shall have the right for itself, its agents and employees to enter upon said premises in reasonable manner and at reasonable times."
F. In 1960, the dedication in the plat was accepted by Dade County by a blanket resolution which accepted all previously unaccepted dedications in the county (R. 326-327). All of the tracts abutting the roads except for Tract 478 were the subject matter of tax deeds issued by the State of Florida through the Trustees of the Internal Improvement Trust Fund in or before 1944.
G. All conveyances of the lots in the subdivision were made by deeds which contained specific references to the plat (R. 627). No deed contained language showing an intent contrary to that evidenced by the plat. None of the conveyances made express reference to the fee title to the roads.
H. On February 25, 1972 (R. 488, 764), Dade County conveyed all of its interest on Elliott Key to the United States. This condemnation proceeding was instituted on September 20, 1972, and a notice of lis pendens was filed September 22, 1972.
I. Sterling traces its title to a quitclaim deed by the original subdivider dated March 3, 1959, to one J.A. Bechard, conveying unspecified tracts in Dade, Broward and Monroe Counties (R. 341, 328, 350-351, 511). Following mesne conveyances, the reversionary interest in the avenues, alleys, roads and boulevards in the Elliott Shores Subdivision was deeded to Sterling on August 16, 1972 (R. 341). There are no tax deeds in Sterling's chain of title.
J. In November 1972, Sterling instituted an action in the Circuit Court of the Eleventh Judicial Circuit in and for Dade County, Florida, to quiet title to the avenues, roads and boulevards in the Elliott Shores Subdivision (R. 453, 318). Dade County, the only named party defendant, disclaimed any ownership interest in the land (R. 485). Thereafter on January 24, 1973, the Florida court issued a judgment quieting title in Sterling (R. 505). The Florida court also found that "the dedication of all avenues, roads and boulevards to the perpetual use of the public for proper purposes has been discontinued by law and the use thereof reverts to the fee owners" (R. 505, J.A. 145).
K. Summary of proceedings before the district court.  No. 72-1509-Civ-CF was instituted by the United States by a complaint filed on September 20, 1972 (R. 1-2), and amended on November 6, 1972 (R. 119), February 21, 1973 (R. 125, 179), April 13, 1973 (R. 225), and November 23, 1973 (R. 275), to condemn various lots in the Elliott Shores Subdivision on Elliott Key, including the fee to the road rights of way abutting *480 the lots (up to the center line) but subject to "existing easements for public roads and highways, public utilities, railroads and pipelines, and free and clear of all encumbrances or liens." The property was acquired for inclusion in the Biscayne National Monument.
L. By motion, the United States asked the court to determine the ownership of the roads and boulevards in the Elliott Shores Subdivision.
M. The federal district court found that there was nothing in the original plat and the subsequent deeds of conveyance to show an intention on the part of the original subdivider to retain a fee interest in the streets and roads. The court held that the conveyances of the lots by reference to the plat carried title to the center of the abutting roadway subject to an easement in favor of the public (R. 627).
N. In addition, the district court held that, to the extent that the lot owners' chain of title showed tax deeds, these deeds would have extinguished the original subdivider's reversion, even assuming such a reversion had been retained.
O. Finally, the district court held that the establishment of the national monument did not effect a discontinuance of the public use of the road rights of way (R. 627-628).
P. As regards the interest of the lot owners, final judgments have been entered and payments have been made to them. All of the judgments were entered pursuant to settlement.
Although some eight questions of law have been certified, we find it unnecessary to decide most of them, because of the view we take of the case.
When Miami Bank, Sterling's predecessor in title, dedicated the platted roads "to the perpetual use of the public for proper purposes," it explicitly reserved to itself any reversionary interest, as against the public. Thereafter, all the lots in the plat were sold; and the deeds described the lots by reference to the plat. Because there was no mention of any reversionary interest in these transactions, the present case falls under the rule stated in Smith v. Horn, 70 Fla. 484, 70 So. 435, 436 (1915):
Where the owner of land has it surveyed, mapped, and platted, showing subdivisions thereof, with spaces for intervening streets or other highways between the subdivisions clearly indicated upon the map or plat, and conveyances in fee of the subdivisions are made with reference to such map or plat, the owner thereby evinces an intention to dedicate an easement in the streets or other highways to the public use as such, the title to the land under the street remaining in the owner or his grantees; and, where such conveyances are made with reference to the map or plat, the dedication of the easement for street purposes cannot be subsequently revoked as against the grantees, and the title of the grantees of subdivisions abutting on such streets, in the absence of a contrary showing, extends to the center of such highway, subject to the public easement. And, where the highway is lawfully surrendered, the then holder of the title to abutting property and to the center of the street has the property relieved of the public easement.
This rule dates from the decision in Florida Southern Ry. Co. v. Brown, 23 Fla. 104, 1 So. 512 (1887), and was applied in Servando Building Co. v. Zimmerman, 91 So.2d 289 (Fla. 1956). In the present case, we hold that the reversionary interest, retained by the subdivider, was subsequently conveyed, together with the lots, subject to the easement in favor of the public. The reversionary interest of Sterling's predecessor in title was distributed among the lot owners, as the lots were sold. It follows that Sterling has no interest of any kind in the parcel; none of its property was taken in the condemnation action, and the road easements in favor of the public are preserved.
In these circumstances, we conclude that consideration of the remaining certified questions would serve no useful purpose.
*481 OVERTON, C.J., and BOYD, ENGLAND and SUNDBERG, JJ., concur.
ADKINS and ROBERTS (Retired), JJ., dissent.